# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 04 2018, 9:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Ernest P. Galos
South Bend, Indiana

Charles W. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

E.W. and E.C. (Minor Children)

and

C.W. (Father) and E.M. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

September 4, 2018

Court of Appeals Case No. 18A-JT-453

Appeal from the St. Joseph Probate Court

The Honorable James N. Fox, Judge

The Honorable Graham Polando, Magistrate

Trial Court Cause Nos. 71J01-1606-JT-32 and 71J01-1606-JT-33



*Appellee-Petitioner.*

**Altice, Judge.**

# Case Summary

This appeal involves the involuntary termination of parental rights with respect to two children, E.W. and E.C., who are half-siblings. E.M. (Mother)[1] and C.W. (Father) are the parents of E.W. T.M. is the father of E.C.[2]

On appeal, Mother presents one issue: whether the St. Joseph County Department of Child Services (DCS) presented sufficient evidence that there was a reasonable probability that the conditions that resulted in the children's removal would not be remedied. Father presents three issues for our review:

---

[1] Mother is sometimes referred to in the record by her maiden name, which begins with the initial "C."

[2] T.M. is not a party to this appeal. He signed a consent to the adoption of E.C., and the termination petition against T.M. was dismissed.

1. Whether DCS presented sufficient evidence that there was a reasonable probability that the conditions that resulted in E.W.'s removal would not be remedied;

2. Whether DCS presented sufficient evidence that the involuntary termination of Father's parental rights was in E.W.'s best interests; and

3. Whether DCS presented sufficient evidence there existed a satisfactory plan for the care and treatment of E.W.

We affirm.

## Facts & Procedural History

## Minor Child E.W.

E.W. was born to Mother and Father on November 27, 2011. On May 28, 2014, prior to DCS's involvement in this matter, and as part of a proceeding related to the paternity of E.W., the probate court issued a modification order that granted Father custody of E.W.[3] On December 22, 2014, in a separate proceeding and at Father's request, the probate court issued a protective order against Mother and in favor of Father and E.W. (as well as other individuals).

---

[3] In 2014, Mother fled to the State of Alabama with E.W. The probate court ordered Mother to surrender E.W. to Father and further ordered that Mother "[not] have parenting time with [E.W.]" *Exhibits Vol. 6* at 29. The court found the parenting-time restriction "necessary to protect the physical and/or mental health of the child." *Id*.

[5] On June 15, 2015, DCS received a report alleging that Father had physically abused E.W., who was three years old at the time. Father and E.W. were living with Father's mother, T.D., and T.D.'s boyfriend. Father was accused of hitting E.W. on three or four occasions within a week, taking his anger out on E.W., and spanking her so hard that a handprint was left on her bottom that lasted two hours. The report also alleged that while E.W. was in the home, Father shoved his mother and "wanted to get into a physical altercation with his mother's boyfriend and then had to be sat on to prevent the altercation." *Father's Appendix Vol. 2* at 42.

[6] The following day, a family case manager (FCM) interviewed Father, and Father admitted to the allegations. That same day, Father was seen by an outpatient therapist, who sent a letter to the FCM indicating that Father had admitted to hitting E.W.'s "bare bottom" with such force that she could not sit down for five to ten minutes, and that, once, Father hit E.W. so hard that she could not sit down for an hour. *Id.*

[7] On June 17, 2015, DCS filed a petition alleging that E.W. was a child in need of services (CHINS). DCS removed E.W. from Father's care and placed her in the care of her paternal grandfather and paternal step-grandmother (Grandparents).

[8] On July 15, 2015, the probate court held an initial hearing and, based upon Father's and Mother's admissions to the allegations set forth in the CHINS petition, adjudicated E.W. a CHINS. On August 14, 2015, the probate court

issued a dispositional order, inclusive of a parent participation plan, which directed Mother and Father as follows:

1. contact the Family Case Manager every week.

2. notify the Family Case Manager of any changes in address, household composition, employment or telephone number within five (5) days of said change.

3. will allow the Family Case Manager or other service providers to make announced or unannounced visits.

4. keep all appointments with any service provider, DCS, or CASA/GAL or advance [sic] notice and good cause will be given.

5. will sign any releases necessary.

6. maintain suitable, safe and stable housing.

7. secure and maintain a legal and stable source of income.

8. complete a parenting assessment and successfully complete all recommendations.

9. complete a psychological evaluation and successfully complete any recommendations that result.

10. meet all the medical and mental health needs of the child in a timely and complete manner.

11. attend all scheduled visitations with the child and comply with all visitation rules.

12. comply with all court orders, protective orders, and no contact orders.

13. dependent on parent's psychological evaluations, visitation will be scheduled based on recommendations.

*Exhibits Vol. 5* at 180-81. DCS filed a progress report on November 2, 2015, indicating that the permanency plan was reunification.

[9] At the three-month progress hearing, held on November 5, 2015, the probate court found Mother and Father to be in compliance with the dispositional order and granted them supervised visits with E.W. at a facility. However, the progress report that DCS filed on June 3, 2016, changed the permanency plan from reunification to adoption based in part on the following:

> Father continues to have violent outbursts in front of children. Parents denied FCM access to the home on 5/16/2016. Mother also denied FCM access to the home on 6/18/2016 and called the police. Upon arrival of the police, she complied and allowed FCM Mickelson and assessment FCM Markert-Green into the home. Father has not been actively taking his medications and has reported he is taking other people's controlled substance medications. Mother is not actively taking her medications as prescribed and providing medications to the [F]ather. Parents had code enforcement called on them due to the condition of the yard. They did work diligently to comply. The family home was without gas, but they were able to get the gas turned on in maternal grandmother's name. Parents have issues during visitation. During their individual [two-hour] visits, they have to

take breaks from spending time with [E.W.]. During their [four-hour] combined visits, they become overwhelmed and have issues making it through the entire visit. During visits, they will play on their phones and not pay full attention to [E.W.]. They regularly tell her what to play with and get upset when she wants to play with something they don't want to play with.

*Id.* at 208. On June 9, 2016, the probate court held a permanency hearing and approved the change in the permanency plan from reunification to adoption.

[10] On October 10, 2016, DCS filed a verified petition for a no contact order, requesting that Mother have no contact with E.W. A hearing was held, and, thereafter, on October 13, 2016, the probate court issued its order granting the no contact request. At the six-month periodic case review hearing, held on February 9, 2017, the probate court again approved the permanency plan of adoption, found Mother and Father to be in partial compliance with the dispositional order, but denied Mother's request to reinstate her visits with E.W. At the twelve-month permanency hearing, held on August 3, 2017, the probate court again approved the permanency plan of adoption and denied Mother's and Father's requests to modify the visitation orders with E.W.

## Minor Child E.C.

[11] E.C. was born to Mother and T.M. on December 26, 2013. On August 21, 2015, DCS received a report alleging that E.C. was a victim of child abuse. At the time, E.C. was one year old and was living with Mother, Father (C.W.),

and a family friend.[4]  The report alleged that E.C. was living in unsafe conditions, that is, E.C. lived in the unfinished basement of the home that only had one egress from the basement; there was minimal lighting; there was no hand-rail on the stairs; and E.C.'s crib was located near the heating unit and the water heater.  Mother was dismissive regarding the safety issues.  The report also alleged that Mother had inappropriately disciplined E.C. by grabbing him by the arms and throwing him on the couch.  E.C. was removed from Mother's custody on August 27, 2015, due to the unsafe living conditions and the allegations of inappropriate discipline.[5]

[12]  Based on the allegations contained in the report, on August 31, 2015, DCS filed a CHINS petition for E.C.  Both Mother and T.M. eventually admitted the allegations, and E.C. was adjudicated a CHINS on November 19, 2015.  On December 7, 2015, the probate court issued its dispositional order, directing that Mother attend the same services and adhere to the same requirements that were set forth in the dispositional order for E.W.'s CHINS case.  Additionally, the dispositional order directed Mother to work diligently with the local

---

[4] Mother and Father lived together at various times from approximately 2009 until 2015, and had an "on again, off again" relationship.  At some point, Mother married T.M.  At the time of the termination hearing, Mother was still married to T.M.

[5] E.C. was initially placed with his biological father, T.M., but was soon removed to foster care due to T.M.'s failure to follow a safety plan that would have prevented the multiple head traumas that E.C. suffered while in T.M.'s care.

prosecutor to establish paternity, take all prescribed medications, and not commit acts of domestic violence. E.C. was placed in foster care.

[13] At the three-month progress hearing, held on March 17, 2016, the probate court found Mother to be in compliance with the requirements set forth in the dispositional order. The court also authorized E.C. to be placed with his maternal grandmother. On April 1, 2016, a court appointed special advocate (CASA) was appointed for E.C.[6]

[14] On or about May 18, 2016, DCS filed a progress report changing the permanency plan for E.C. from reunification to adoption, based in part on the following: "Mother refused FCM Mickelson access to the home on 5/16/2016 to verify the appropriateness of the home. Mother is also not regularly attending her therapy sessions and has issues with cooperating with the home-based case worker, becoming upset and stopping interacting with the worker." *Id*. at 79. On June 9, 2016, a twelve-month permanency hearing was held, following which the probate court approved the change. E.C. was ordered to be placed in a pre-adoptive foster home, and visitation with his grandparents was denied.

[15] A second permanency hearing was held on August 11, 2016, and the probate court again approved the permanency plan of adoption. At the six-month periodic case review hearing, held on February 9, 2017, the court approved the

---

[6] The same CASA also was appointed for E.W.

permanency plan of adoption, found Mother to be in partial compliance with the dispositional order, but denied Mother's request to reinstate visitation with E.C. At the permanency hearing, held on August 3, 2017, the probate court again approved the permanency plan of adoption and denied Mother's request to modify the visitation orders.

# E.W. and E.C.

[16] DCS filed its Verified Petition for Involuntary Termination of the Parent-Child Relationship Involving a Child in Need of Services for both E.W. and E.C. on June 14, 2016. Mother and Father did not attend the initial termination of parental rights (TPR) hearing, held on August 4, 2016. After hearing evidence, the probate court granted the TPR. The court appointed the Public Defender Program to represent Father and Mother in the matter, and Father filed a motion to set aside the court's granting of the TPR. On October 27, 2016, the court vacated its TPR order, suspended Mother's and Father's visitation with E.W., and suspended Mother's visitation with E.C.

[17] On October 10 and 11, November 17, and December 12, 2017, the probate court heard testimony on the TPR matter. On February 6, 2018, the court issued a new order granting the TPR, and the court terminated the parent-child relationship between E.W. and Mother and Father, and between E.C. and Mother. Mother and Father now appeal. Additional facts will be provided as necessary.

# Discussion & Decision

[18]    Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture," we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating one's parental rights is not to punish the parent, but rather to protect the child. *Id*.

[19]    When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[20]     When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[21]     "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

[22]     For our purposes, to terminate a parent-child relationship, DCS must have alleged and proven by clear and convincing evidence that:

> (b)(2)(A) . . . (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> *****
>
> (B) . . . (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[; or]

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[;]
>
> *****
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." I.C. § 31-35-2-8(a) (emphasis added).

## 1. Mother's Claim – Remedy of Conditions Resulting in Removal

[23] Mother argues, essentially, that DCS did not present sufficient evidence to support the probate court's findings that there was a reasonable probability that the conditions that resulted in the children's removal from her care would not be remedied, because, according to Mother, the evidence established that she "maintained a relationship with her children," "attended visits with her children," and "resolved the issue of improper living conditions for the children that arose at the inception of E.C.'s case." *Mother's Brief* at 16. Mother maintains that she was not involved in Father's inappropriate discipline incident with E.W.; she "engaged in visitation with [her] children that was more than sporadic in nature"; she attempted to visit her children by requesting

the probate court to allow visitation; although she had a "significant number of [residential] moves during the pendency of the case[,] . . . [n]o evidence was presented indicating that any of her new residences were similar to the basement conditions she was living in at the outset of E.C.'s case"; she made "honest efforts" to participate in the services DCS provided; and she "displayed a tenacity to keep trying to [obtain steady employment]." *Id.* at 16-19.

[24] In deciding whether the conditions that resulted in a child's removal will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[25] The juvenile court also may consider, as evidence whether conditions will be remedied, the services offered to the parent by DCS, and the parent's response to those services. *Id.* at 1252. A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App.

2002). A pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing social services, in conjunction with unchanged and unacceptable home conditions, will support a finding that there exists no reasonable probability that the conditions will change. *Matter of D.B.*, 561 N.E.2d 844, 848 (Ind. Ct. App. 1990).

[26] Here, Mother's parenting time with E.W. was revoked in May 2014, as part of a proceeding related to the paternity of E.W., when Mother fled to the State of Alabama with E.W. The probate court found that the parenting-time restriction was necessary to protect E.W.'s physical and/or mental health. In August 2015, E.C. was removed from Mother's care because of unsafe living conditions and Mother's inappropriate discipline of E.C.

[27] During the termination hearing, a clinical forensic psychologist testified that he had administered parenting tests to Mother, the results of which indicated that Mother had an "increased risk of physical abuse toward her children." *Transcript Vol. 2* at 15-16. The psychologist diagnosed Mother with depression and told the probate court that Mother reported experiencing hallucinations, specifically, hearing the voices of deceased relatives. He recommended that Mother take prescription medication to improve her mood and that she participate in individual therapy to help with her depression, her diminished coping skills, and her anger management problems.

[28] Linda Metcalfe-Smith, Mother's therapist at Dockside Services, testified that Mother, at first, regularly attended her weekly individual therapy sessions and

even increased her attendance to two sessions per week. However, within a short period of time, Mother's attendance began to wane to the point where she did not attend the sessions at all. In Metcalfe-Smith's opinion, therapy was not a priority for Mother. Metcalfe-Smith informed the probate court that Mother's goals in therapy were to learn coping skills, practice mindfulness, and work on impulse control. Metcalfe-Smith testified that Mother did not make progress toward her goals because she failed to consistently attend the therapy sessions.

[29] Jonathan Rosengren, Mother's therapist at Oaklawn Community Mental Health, also testified during the termination hearing. Rosengren informed the probate court that he interviewed Mother and completed an intake assessment, during which Mother was "cooperative, agitated at times, depressed, [and] irritable." *Id*. at 58. Rosengren testified that Mother told him she was not taking the medication that had been prescribed for her mental illness; she denied the allegations set forth in the children's CHINS cases; and she described the origin of the case involving E.C. as a "misinterpretation of discipline issues." *Id*. at 61. Rosengren described Mother as "lacking insight." *Id*. at 62. He recommended that Mother participate in individual therapy. Mother, however, did not return to Oaklawn for services after the completion of her initial assessment.

[30] FCM David Mickelson, who was assigned to the CHINS cases in 2015, also testified at the termination hearing. His testimony confirmed that Mother disregarded the directives set forth in the dispositional orders. He specifically testified that Mother "rarely" communicated with him, and that he had to find

out from third parties where Mother was residing and whether "she had a new job." *Transcript Vol. 3* at 80. He informed the probate court that Mother would not allow him access to her residence when he arrived for site visits; she would regularly no-show for her appointments with service providers; and she was unable to maintain suitable, safe and stable housing. FCM Mickelson testified that Mother was living in a home with T.M. and his family, and approximately sixteen people were living in the home.

[31] Regarding employment, FCM Mickelson testified that Mother had not held steady employment, and that Mother reported having six or seven different jobs since the CHINS petitions were filed. On one occasion, Mother lied to the FCM about being employed.

[32] FCM Mickelson confirmed that Mother had stopped taking her mental health medications, and that she did not regularly attend therapy sessions. He further testified that in 2015, Mother missed two supervised visits with E.C. and six supervised visits with E.W. In 2016, Mother missed two visits with E.C. and eleven visits with E.W. Regarding the visits, FCM Mickelson testified that Mother "doesn't care. It's – during visits even if the child wanted to do something else, no matter which child it was, either child, um, if it wasn't what she wanted to do she wouldn't participate in it." *Id*. at 85. When Mother did visit with the children, she did not give the children her full attention and, instead, paid more attention to her cell phone. Mother told FCM Mickelson that "she didn't have a bond with [E.W.] and she never has had a bond with her." *Id*. at 89. When the FCM discussed with Mother the possibility of

termination of Mother's parental rights, Mother was focused on reunification with E.C. but not with E.W. Regarding parenting education classes, Mother did complete the first round of classes. However, when it was recommended that Mother complete a second round of classes, she only completed half of the classes.

[33] Mother testified on the last day of the termination hearing. She informed the probate court that she was, at the time, unemployed but was looking for work. She also testified that she was temporarily living with a friend because she lost her job, and she "got kicked out of [her] mother-in-law's [home]." *Transcript Vol. 4* at 58. When asked how long it would take her to provide a stable home for her children, she answered, "Probably about six months to a year." *Id.* at 72. Mother admitted that she did not have a bond with her daughter.

[34] In terminating Mother's parental rights to the children, the probate court entered a ten-page order of detailed, well-supported findings and conclusions regarding Mother's failure to take the allegations against her seriously, lack of cooperation during assessments, failure to complete and/or benefit from court-ordered reunification services, history of deficient parenting, income instability, and inability to provide stable and safe housing for the children. Based on these and other findings, the probate court concluded that "the evidence clearly and convincingly establishes a reasonable probability that Mother will not remedy the conditions resulting in the [c]hildren's removal." *Mother's Appendix Vol. 3* at 15. A review of the record, specifically the testimony presented at the termination hearing, reveals that clear and convincing evidence supports the

probate court's findings, and these findings, in turn, provide ample evidence to support the court's ultimate decision that there is a reasonable probability the conditions resulting in E.W.'s and E.C.'s removal will not be remedied. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

## 2. Father's Claims

[35] Father first challenges the sufficiency of the evidence supporting the probate court's findings as to subsection (b)(2)(B) of the termination statute cited above (that is, remedy of conditions resulting in removal/threat to child's well-being). *See* I.C. § 31-35-2-4(b)(2)(B). Initially, we observe that subsection (b)(2)(B) of the termination statute is written in the disjunctive. Thus, DCS was required to establish only one of the two requirements of the subsection by clear and convincing evidence. *See L.S.*, 717 N.E.2d at 209. Nevertheless, the probate court determined that both conditions of this subsection had been satisfied.[7] We, however, need only consider whether sufficient evidence supports the probate court's determination that there is a reasonable probability the conditions resulting in E.W.'s removal from Father's care will not be remedied.

---

[7] The probate court concluded that the evidence clearly and convincingly established a reasonable probability that Father would not remedy the conditions resulting in E.W.'s removal and that continuation of the parent-child relationship between Father and E.W. posed a threat to E.W.'s well-being.

# A. Remedy of Conditions Resulting in Removal

[36] E.W. was removed from Father's care because he excessively disciplined her by spanking her bottom with such force that he left a handprint that lasted two hours. On appeal, Father argues that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the conditions that resulted in E.W.'s removal from his care would not be remedied – specifically, that Father is likely to inappropriately spank E.W. in the future. According to Father, "the physical or psychological harm to [E.W.] caused by the spanking was not shown to be significant"; "[t]here were no bruises or other marks on the child when [DCS] investigators observed the child approximately 24 hours after the incident"; and "not one witness at trial ever claimed to have seen [Father] physically abuse the child." *Father's Brief* at 10. Father maintains that he exhibited remorse for his actions, admitted that he took his anger out on E.W. in the form of the excessive discipline because he was angry with his mother's boyfriend, and admitted he had anger problems.

[37] In reaching its conclusion that the evidence clearly and convincingly established a reasonable probability that Father would not remedy the conditions resulting in E.W.'s removal, the probate court found as follows:

> And at least one service was as ineffective with Father as it was with Mother: as [DCS] alleges, ". . . he failed to meaningfully benefit from [parenting] classes.

***

> Though [Father] is prescribed medication for at least some of [his mental health] conditions[, including depression], and Dr. Burgess[, the clinical forensic psychologist,] specifically noted that someone in Father's position should follow the prescription regimen "unrelentingly," Father has largely failed to take it as prescribed. Indeed, Father stated, with respect to the medication for his depression, that "I took myself off of that."
>
> In his proposed findings, Father noted that "Dr. Burgess suggested that [Father] could likely avoid any future instances of abuse or neglect provided he participated in counselling [sic] and takes the medications prescribed to him." This is likely true, but for the reasons above, the Magistrate finds it improbable that he will do the latter for any significant period of time. . . .

*Mother's Appendix Vol. 3* at 16. We find that the testimony presented at the termination hearing – specifically, that regarding Father's risk of abusing E.W. and Father's need to continue to take his prescribed medication – supports the probate court's findings, and the court's ultimate conclusion, that the conditions resulting in E.W.'s removal would not be remedied.

[38] The same clinical forensic psychologist that evaluated Mother also evaluated Father. When he testified at the termination hearing, the psychologist informed the probate court that he diagnosed Father with depression. While the psychologist determined that Father was not experiencing a significant level of parenting stress at the time of the evaluation, the psychologist did determine that Father was at an increased risk for physically abusing his child because he

achieved a significantly elevated abuse score on the Child Abuse Potential Inventory assessment.[8]

[39]     The psychologist recommended (among other things) that Father remain "medically compliant with his prescriptions[,] any prescriptions or a prescription regimen, [attend] individual therapy to address anger and more adaptive coping mechanisms . . . , [and participate in] parenting education to address the maladaptive aspects of his parenting that contribute to his increased risk." *Transcript Vol. 2* at 29. When asked how important it was for Father to continue with psychiatric treatment and his prescription regimen, the psychologist replied:

> I believe that treating the symptoms of depression medically, particularly in cases where there is an increased potential for risk of neglect or abuse, becomes central to stabilizing the parent's mood so they can engage in services and potentially become more effective parents, thus reducing the risk for neglect and abuse.

*Id.* The psychologist further testified that without the intervention of services, "it's possible that [Father] may remain at the same level of risk [for potential

---

[8] During the termination hearing, the psychologist explained that Father invalidated the Child Abuse Potential Inventory assessment, "that is to say he's on the faking good index. He significantly elevated that index[,] invalidating that particular test except that when the invalidation occurs on the faking good index, the abuse scale score is still interpreted and [Father] had a significantly elevated abuse scale score." *Transcript Vol. 2* at 27-28.

abuse or neglect] he was some two years ago[,] or his risk could have increased."[9]  *Id.* at 38-39.

[40]    Father's home-based therapist, Renee DeRosa, also testified at the termination hearing.  She informed the probate court that Father's treatment goals included improving his anger management and Attention Deficit Hyperactivity Disorder (ADHD).  She testified that Father was prescribed medication for his ADHD, and that although Father had stopped taking his medication for a month or so, he appeared to be calm.  However, she also testified that because Father has ADHD, "to get him to focus it's important that he takes the medication and takes it consistently, because usually he gets very, um, erratic."  *Id.* at 93.

[41]    Regarding the therapy sessions, DeRosa informed the court that Father had made progress.  She acknowledged, however, that during a child and family team meeting, Father had an outburst of anger and "exploded."  *Id.* at 100.  She emphasized that for Father to achieve his therapy goals, it was imperative that he take his medication and continue with his therapy sessions.  She testified that if he failed to do so, "he could be explosive."  *Id.* at 113.

[42]    FCM Mickelson testified regarding Father's prescription medication regime.  FCM Mickelson informed the probate court that Father "either forgets to get [his prescription] filled in time or doesn't get it filled or doesn't feel like he needs it."  *Transcript Vol. 3* at 101.  He went on to testify that when Father "is

---

[9] By the time the psychologist testified, it had been two years since he had evaluated Father.

on his meds he's more calm and he's more cheerful and presents more happy, more smiley. He's more open and doesn't have any outbursts." *Id*. at 110-11. When Father is not taking his medication, "[h]e can become agitated easily and can have outbursts." *Id*. at 111. As for parenting classes, the FCM testified that Father did complete the first round of parenting classes. Father, however, did not complete the recommended second round of classes. The FCM also testified that Father continues to display a temper, and that he recently became upset at a child and family team meeting, "slammed his hands down on the desk," "gritt[ed] his teeth," and "had to storm out for a while." *Id*. at 104, 140.

[43] Father also testified at the termination hearing. He admitted that he had stopped taking his depression medication, and that he, only recently, began to retake his ADHD medication.

[44] Given this evidence, we find that DCS proved by clear and convincing evidence that the conditions resulting in E.W.'s removal would not be remedied. The probate court's findings are not clearly erroneous.

## B. Best Interests of Child

[45] Father also argues that there was insufficient evidence to support the probate court's conclusion that termination of Father's parental rights was in E.W.'s best interests. In determining what is in the best interests of the children, the trial court is required to look beyond the factors identified by DCS and to look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must

subordinate the interests of the parent to those of the children. *Id*. The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id*. The recommendation by both the FCM and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *See Ramsey v. Madison Cnty. Dep't of Family and Children,* 707 N.E.2d 814, 818 (Ind. Ct. App. 1999) (concluding that a counselor's testimony that it would be in the child's best interest to terminate the parent-child relationship, "along with the evidence that the condition will not be remedied and that the relationship poses a threat to Child" was sufficient to show by clear and convincing evidence that termination was in child's best interest).

[46] Beyond the findings previously discussed, the probate court made several additional pertinent findings when it determined that termination of Father's parental rights was in E.W.'s best interests. Specifically, the court found that "neither parent has provided, or can presently provide, a suitable home for either Child. . . . Indeed, it would be an understatement to say that parents have merely lacked 'stable' housing – their housing situations have been peculiarly chaotic . . . ." *Mother's Appendix Vol. 3* at 17-18. The court further found that "[b]oth parents struggle even with quotidian tasks; Father, for example, has poor dental health and struggles to pay bills. While contending that he has been able to maintain employment previously, he concedes that 'he has struggled with issues of employment and in maintaining a home which

would be suitable for' E.W." *Id.* at 18. The court placed particular weight on the parents' frequent missed visits with the children and the parents' lack of interest in the children. The court specifically found that "[w]hile the Magistrate recognizes that supervised visits are extraordinarily difficult on both parents and children, the least parents can do is show up, reasonably on time, exercise the entirety of the visit, put their phones away, and engage with their Children – neither parent did these things with any consistency." *Id.* Based on these and other findings, the probate court concluded that termination of Father's parental rights was in E.W.'s best interests. These findings and conclusion are supported by the evidence in the record.

[47] In 2015, Father missed six of the eight scheduled visits with E.W. In 2016, he missed eleven scheduled visits with E.W. When Father did visit with E.W., it was reported that he was not "fully grasping and applying things learned" during the parenting classes, and he spent more time engaging with the visitation supervisor than with E.W. *Exhibits Vol. 5* at 198. During two-hour visits with E.W., Father had to take frequent breaks. Father struggled to make it through the four-hour visits with E.W. and "became overwhelmed." *Id.* at 208. Father played with his cell phone and did not give his full attention to E.W. During the visits, he regularly told E.W. "what to play with and [got] upset when she want[ed] to play with something [that Father did not] want to play with." *Id.* When it was recommended that Father retake parenting classes, he only completed half of those classes because "I had problems with

my car and I had no way – no ride and no way to get [to the classes.]"
*Transcript Vol. 4* at 17.

[48] Father was unable to secure stable housing.  Testimony was presented that Father had lived in at least ten different places since E.W. was removed from his care in 2015, including a motel.  At the time of the termination hearing, Father was living in a trailer with his mother (with whom he had physical altercations) and an individual whose last name he could not recall.  Home-based therapist DeRosa expressed concerns about Father being reunited with E.W. because he did not have stable housing.

[49] Father has never been able to live on his own as an adult.  Father testified, "I'm not physically stable to live by myself because of my . . . ADHD and my hyperactivity and all that.  I need, basically, help if I had my kids."[10]  *Transcript Vol. 3* at 23.  He admitted that if E.W. was to ever live with him, he always would need someone present to help him with the child.  DeRosa testified that she did not think Father would ever be able to parent E.W. on his own because he struggles to remember the basic needs of a young child.  She further testified, "[Father] would struggle with – cognitively, he would struggle to remember to pay bills, to remember to make appointments . . . ."  *Transcript Vol. 2* at 101.

[50] Regarding Father's history of employment, FCM Mickelson testified that Father was doing "better over the last year . . . , but he was jumping around

_____

[10] Father is the father of two other children who, in separate proceedings, were found to be CHINS.

from job to job for a while." *Transcript Vol. 3* at 98. Father had been working in a seasonal job since April 2017. However, at the time of the hearing, Father was not employed. Father had held approximately six jobs since the CHINS case was initiated. Father's driver's license is suspended.

[51] FCM Mickelson supported termination of Father's parental rights. He testified as follows regarding the parents' stability and E.W.'s well-being since being removed from her parents' care:

> At this time neither parent is stable. We're at the same point that we were when we first got involved. [E.W.] has just continued to excel. She's had no outbursts, no anger and she just is in a stable, safe environment at this time.
>
> *****
>
> Father has had bouts of doing well, but then he'll end up getting back around his [biological] mother regularly, stop taking his meds, get back around [Mother] and just start going downhill and not participating, not doing anything.

*Id.* at 110. The CASA, Richard Zander, testified that he supported the adoption of E.W. by her Grandparents.

[52] To bolster his argument that termination of his parental rights was not in E.W.'s best interests, Father attempts to compare his situation to that of the parent in *In re Invol. Term. of Parent-Child Rel. of R.S.*, 56 N.E.3d 625, 626 (Ind. 2016), where our Supreme Court reversed a termination of parental rights after

concluding that the State had failed to prove that termination was in R.S.'s best interests.

[53] However, the facts in *R.S.* are distinguishable. R.S. was a ten-year-old boy who had a close bond with his father. R.S.'s father exercised regular visitation with R.S. and repeatedly expressed his desire to parent his son. Both the guardian ad litem and the trial court believed that visitation between R.S. and his father was in R.S.'s best interests. Here, Father missed multiple visits with E.W. When he did visit with her, Father was overwhelmed, not engaged, and was more interested in his cell phone than with E.W. Father has not visited with E.W. since July 2016. In addition, the FCM recommended termination of Father's parental rights, and the CASA supported the plan that E.W. be adopted.

[54] In light of the evidence presented, we find that the probate court's conclusion that termination of Father's parental rights was in E.W.'s best interests is supported by clear and convincing evidence.

## C. Satisfactory Plan for E.W.

[55] Father next presents an argument, in two parts, that the probate court's finding that DCS had a suitable plan for E.W.'s care was erroneous. Father does not dispute that DCS had a plan for E.W., that is, adoption of E.W. by her Grandparents. Rather Father, first, argues that this was not a satisfactory plan because, according to Father, any deficiencies in his parenting were learned from his father – the individual that DCS proposed adopt E.W. In support of

this argument, Father points to testimony from the clinical forensic psychologist and from therapist DeRosa that physical abuse he allegedly suffered from his father and stepmother attributed to his cognitive problems and ADHD. Second, Father argues that the probate court failed to prove that "it would not have been better to establish a guardianship rather than terminating the parental rights of [Father]." *Father's Brief* at 16.

[56]  Here, the probate court found as follows:

> Father testified that[,] "Only thing I hold against people is the way I was treated when I was growing up . . . I am afraid that the same thing will happen to" E.W.  But the Magistrate declines to credit Father's characterization.  While Paternal Grandfather and Step-Grandmother's ideas of physical discipline may now be seen as outdated, and may have even been retrograde at the time, the Magistrate finds it significant that Father and Paternal Grandfather were recently closely aligned:  they appeared together in attempting to remove E.W. from Mother's care when the latter absconded to Alabama.  Father's allegations are of recent vintage, coming well after E.W. came to live with Paternal Grandfather.
>
> Finally, there is both a procedural and a substantive problem with the proposal for guardianship.  Procedurally, though Father alleges that the Court should "grant Proposed Guardian's request for guardianship of the Children," there does not appear to be any pending "GU" cause for E.W.  This is as it should be[,] given that the Children have been found to be CHINS, no Court has jurisdiction to entertain a guardianship unless the CHINS Court has approved guardianship as a permanency plan. . . .  The CHINS Court here never has.

> And even if the Court could entertain a petition for guardianship, same would be substantively inappropriate. Given the findings above, Parents' issues require that the Children be given a permanency plan that is, in fact, more "permanent" than a mere guardianship would provide.

*Mother's Appendix Vol. 3* at 19 (citation omitted).

[57] For a plan for a child's care and treatment to be "satisfactory," for purposes of I.C. § 31-35-2-4(b)(2)(D), it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *D.D.*, 804 N.E.2d at 268. This court has held that adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *See In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). This court also has found that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate. *See In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.

[58] Based on these standards, we conclude that DCS's plan of adoption for E.W. was satisfactory. Contrary to Father's assertions, we need not address whether paternal grandfather is a suitable adoptive parent because that determination is within the jurisdiction of the adoption court. *See id.* (citing *In re M.B.*, 921 N.E.2d 494 (Ind. 2009)).[11] As for Father's argument regarding guardianship,

---

[11] The probate court, in its findings, cited *In re A.S.*, 17 N.E.3d at 1007, for the holding that it is within the adoption court's jurisdiction to determine whether an adoptive placement is appropriate. Father argues that

"DCS is only required to establish that there is a satisfactory plan for the care and treatment of the child in termination proceedings." *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (internal quotations omitted); *see also id*. (holding that termination of parental rights was appropriate despite fact that father's proposed alternative living arrangement for child was not considered because termination statute does not require DCS to consider relative placement). Accordingly, we conclude that the probate court's finding that DCS's plan for E.W.'s care and treatment was satisfactory was supported by clear and convincing evidence and was not clearly erroneous.

Judgment of the probate court is affirmed.

Brown, J. and Tavitas, J., concur.

---

the probate court "read the opinion . . . as completely eliminating the statutory requirement that the State prove by clear and convincing evidence that there is a satisfactory plan for the child's care and treatment in favor of a rule in which DCS may merely be trusted to do so because they say so." *Father's Brief* at 15. We disagree and find no merit to Father's argument.